## GRISE v. THE STATE.

1.  INDICTMENT FOR CRUELTY TO ANIMALS : *Allegations of value or owner-
    ship.*
    In an indictment under the Act of 1879, for needlessly killing or mutilating
    an animal, the value or ownership of the animal need not be alleged.

2.  SAME : *Burden of proof as to character of the act.*
    In an indictment for "needlessly killing an animal," the State must prove
    not only the killing, but that it was done under such circumstances as,
    unexplained, would authorize the jury to believe that it was needless, in
    the sense of the Statute.

3.  STATUTES : *Construction of Act to Prevent Cruelty to Animals.*
    The term "needlessly," in the Act of 1879, "For the Prevention of Cruelty
    to Animals," has no reference to the lawfulness or unlawfulness of the
    act of killing or mutilating, except as the Statute makes it unlawful *as*
    needless ; nor is it to be construed as characterizing an act which might,
    by care, have been avoided. It simply means an act done without any
    useful motive, in a spirit of wanton cruelty, or for the mere pleasure of
    destruction.

APPEAL from *Logan* Circuit Court.

Hon. J. H. ROGERS, Circuit Judge.

*C. B. Moore, Attorney-General,* for the State.

The Opinion states the case.

1. INDICT-
MENT FOR
CRUELTY
TO ANI-
MALS:
Allega-
tions of
value or
ownership
unneces-
sary.

EAKIN, J. The appellant was indicted, under an Act, approved March 11th, 1879, "For the prevention of cruelty to animals." The first section, *inter alia*, makes it a misdemeanor to "needlessly mutilate or kill " * * * " any living creature." The indictment simply charges that appellant did, unlawfully and needlessly, kill a hog, of the value of five dollars, being a living creature. No allegations of value, or of ownership, were essential.

The proof, on the part of the State, tended to show that appellant had killed a pig, belonging to a neighbor, by a blow on the head with a stick, producing sudden death. The pig was in a field belonging to appellant, in which corn and wheat were growing. It had, before that time, been in the habit of trespassing there with others, and the defendant had repeatedly applied to the owner, a lady, to pen her hogs, or keep them out of his field. This, for a while, she did. But they were again turned out, and the one in question being found again in appellant's field, he killed it on the spot—with no more circumstances of cruelty than would attend the taking of life at one blow.

On defendant's part, the proof—besides that the pig had been several times in the field, eating corn and wheat—tended further to show that it was a very small one, which could easily get between the rails of any ordinary country fence, and that there was around that field a very good fence.

There was proof, on both sides, as to the value, and some tending to show that appellant had paid the value to the owner—all of which was entirely irrelevant, save as it might, as part of the *res gestæ,* show the purpose, or motive, of the killing. Payment to the owner could not atone it, if it were *needless* in the sense of the Statute, nor would failure to make compensation aggravate the offense.

Upon the trial, defendant asked six instructions, which were refused throughout. In lieu thereof, the court gave two of its own motion—all against objection. The defendant was found guilty, and sentenced to a fine of two dollars. He moved for a new trial upon the grounds of error, in refusing the instructions asked; in giving those by the court of its own motion; and because the verdict was against law and evidence. The motion was refused, and he appealed.

This court is called for the first time to construe a new statute, belonging to a class which must ever be more or less vague in their meaning, and extremely difficult of administration.  They are the outgrowth of modern sentiment, and are of comparatively recent origin.  They attempt to transcend what had been thought, at common law, the practical limits of municipal government.  They spring, originally, from tentative efforts of the New England colonists to enforce imperfect but well recognized moral obligations ; a thing much more practical in small isolated communities than in populous governments.  They first had in view only to compel benevolence and mercy to those useful animals, which being domesticated, and wasting their lives in man's service, were supposed to be entitled to his kind and humane consideration.  Such statutes appealed strongly to the instincts of humanity.  They were adopted in many of the States, and recently in England ; and the impulse which favored them has endeavored to enlarge their beneficence, until, in our law they are made to embrace " all living creatures."  It is obvious that laws of this class, pressed to this extreme limit, must be handled by the courts with great care, and we feel it due the Legislature to do so, to prevent their becoming dead letters.  They must be rationally construed with reference to their true spirit and intention.  It must be kept in mind that they are not directed at all to the usual objects of municipal law, as laid down by BLACKSTONE.  For example :  They are not made for the protection of the absolute or relative rights of persons, or the rights of men to the acquisition and enjoyment of property, or the peace of society.  They seem to recognize and attempt to protect some abstract rights in all that animate creation, made subject to man by the creation, from the largest and noblest to the smallest and most insignificant.  The rights of persons and the security of pro-

perty and the public peace, are all protected by other laws, with appropriate sanctions. The objects of the two classes should not be confounded. It will lead to hopeless confusion. The peculiar legislation we are now called to discuss must be considered wholly irrespective of property, or of the public peace, or of the inconveniences of nuisances. The misdemeanors attempted to be defined may be as well perpetrated upon a man's own property as another's, or upon creatures, the property of no one, and so far as one act is concerned, it is all the same whether the acts be done amongst refined men and women, whose sensibilities would be shocked, or in the solitude of closed rooms or secluded forests.

It is in this view that such acts are to be construed, to give them, if possible, some beneficent effect, without running into such absurdities as would, in the end, make them mere dead letters. A literal construction of them would have that effect. Society, for instance, could not long tolerate a system of laws, which might drag to the criminal bar, every lady who might impale a butterfly, or every man who might drown a litter of kittens, to answer there, and show that the act was needful. Such laws must be rationally considered, with reference to their objects, not as the means of preventing aggressions upon property, otherwise unlawful; nor so as to involve absurd consequences, which the Legislature cannot be supposed to have intended. So construed, this class of laws may be found useful in elevating humanity, by enlargement of its sympathy with all God's creatures, and thus society may be improved. Although results in other States and in England, have not, as we judge from the paucity of decisions, been such as to excite sanguine hopes, yet to a limited extent the objects of the laws may be practically obtained. It is the duty of the courts to co-operate to that end, so far as the rules of construction may warrant.

Grise v. The State.

There are civil laws for the recovery of damages for trespass, and criminal laws for the punishment of malicious mischief, and trespass and injury to property. In a suit or indictment, under these, there are appropriate defenses, not applicable to an indictment for cruelty or for needless killing. They should, one or the other of them, have been resorted to by the individual, or the State, if the object had been to recover damages for the loss of the pig, or to protect society from violent aggressions on property. The law under which this indictment was framed has no such object, and cannot be made a substitute for the others. The issue was, did the defendant *needlessly* kill the pig. The burden of proof was upon the State to show not only the killing, but that it was done under such circumstances as, unexplained, would authorize the jury to believe that it was *needless* in the sense of the Statute. The controversy does not turn at all upon the lawfulness or unlawfulness of the act, except in so far as the Statute itself might make it unlawful *as* needless.

2. Burden of proof as to character of the act.

From the view we have taken of the nature and scope of this class of acts, it is obvious that the term "needless" cannot be reasonably construed as characterizing an act which might by care be avoided. It simply means an act done without any useful motive, in a spirit of wanton cruelty, or for the mere pleasure of destruction. Other portions of the act are directed to prevent undue torture, or suffering, which do not come here in question. However unlawful the act may be, and whatever penalties might be incurred under the Statutes, the defendant should not, under this indictment, have been convicted, if he had some useful object in the killing, such as the protection of his wheat and corn.

3. Construction of the statute. Meaning of "needlessly."

The provisions of different Statutes must be regarded; and acts really criminal, must be punished under *appropriate* indictments. Malicious mischief and needless killing are distinct.

Grise v. The State,

The defendant, in effect, asked the court to instruct:

*First.* That the burden was on the State to show not only the killing but that it was needless, and that "needless" meant a killing in mere idle wantonness, without being in any sense whatever beneficial or useful to defendant.

*Second.* That it was for the jury to determine whether or not it was "needless," and that they might consider the facts, that the pig was found in the field where there was corn and wheat, that it had frequently been there before, and all other facts and circumstances in evidence.

*Third.* That the jury must find before conviction that there was no necessity or cause whatever for the defendant to kill the animal.

*Fourth.* That considering the circumstances, if the jury found that the animal was trespassing upon the defendant's crops and destroying them, and that he had up to the time of the killing used all reasonable means to prevent it, and that the act of killing did prevent it, they would be warranted. in finding that it was not needless.

*Fifth.* That the word "needlessly," used in the Statute, relates to a wanton and cruel act, and not to one which is the result of necessity, or reasonable cause.

*Sixth.* That unless the defendant was guilty of wanton and needless acts of cruelty to the animal, resulting in unjustifiable physical pain, they should acquit.

We think that the spirit of all the foregoing instructions, except the last, was in harmony with the true intent and meaning of the Act—as nearly so as moral acts can be characterized by the formulas of language—at all times a. difficult task. They are very nearly in accord with the views we take of the Statute. The last was erroneous. A needless killing could not be justified by an easy death.. Cruelty was no part of the charge, although it is made. criminal under the other sections.

The instructions given by the Court, of its own motion, were as follows:

*First.* That the proof of killing a *pig* would support the allegation of the killing of a hog.

This is unquestionably correct.

*Second.* "If the jury believe from the evidence that defendant, in this county," etc.,    *    *    *    "needlessly killed the animal mentioned in the indictment, they should convict, notwithstanding it may have been trespassing within defendant's inclosure at the time it was killed. 'Needlessly' means without necessity, or unnecessarily, as where one kills a domesticated animal of another, either in mere wantonness or to satisfy a depraved disposition, or for sport or pastime, or to gratify one's anger, *or for any other unlawful purpose.*"

But for the last clause of this instruction, it would not be, in the abstract, subject to criticism, but it is, we think, erroneous in holding all killing *needless*, in the sense of the Statute, done for an unlawful purpose. For unlawful trespasses, other remedies are provided. There are other Statutes for their prohibition. All acts of killing are not "needless," in the meaning of the Statute, which are unlawful. A man, for instance, might kill his neighbor's sheep for food, which would be *unlawful*, and either a trespass or felony, according to the circumstances; but such killing could not, with any show of reason, come within the intention of the Act in question. The lawfulness, or unlawfulness, of the act, has really no bearing upon its character, as charged.

Had the last clause been omitted, in this instruction, it would not, however, have been sufficiently instructive, in all points, to have caused the refusal to give the defendant's first five instructions, in substance, as asked. He was en-

titled to have them particularly impressed upon the jury, in a matter which, being new, they might misapprehend.

The first of the English Statutes directed to the enforcement of benevolence and kindness to inferior animals, was passed in 1822. It was to prevent "cruel and improper treatment of cattle." It contained a provision that, "if the complaint should appear to the magistrate, on the hearing, to be frivolous, or vexatious, then the complainant was to be ordered to pay to defendant any sum of money, not exceeding the sum of twenty shillings, as compensation for the trouble and expense to which said party may have been put by such complaint."

This was a wise precaution. The case now before us, is strongly suggestive of the necessity of some such safeguard in the administration of a Statute of much wider scope, embracing all living creatures. This is a matter, however, for the legislative department. The power of the judiciary only extends to see that a Statute, so well intended, shall not be extended to absurd consequences, and brought into contempt by too literal a construction of language.

For error in overruling the motion for a new trial, reverse the judgment, and remand the cause for further proceedings, consistent with law, and this opinion.